IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DEBRA D. GRIFFIN,            *

                           *

    Plaintiff,          *

                           *

vs.                    *   CIVIL ACTION 07-00258-KD-B

                           *

MICHAEL J. ASTRUE,       *

Commissioner of          *

Social Security,        *

                           *

    Defendant.         *

## REPORT AND RECOMMENDATION

Plaintiff Debra D. Griffin ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for period of disability, disability insurance benefits, widow's insurance benefits based on disability, and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., and 1381 et seq.  Oral argument took place on February 27, 2008.  Upon careful consideration of the administrative record, oral argument and the memoranda of the parties, it is **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED.**

## I.   Procedural History

Plaintiff protectively filed applications for supplemental security income benefits, disability income benefits, and widow's insurance benefits based on disability on December 15, 2003.  She

alleged that she has been disabled since June 1, 2001[1], due to sarcoidosis of the lungs, enlarged heart, asthma, bronchitis, high blood pressure, and depression. (Tr. 87-88, 256-258). Plaintiff's applications were denied initially and upon reconsideration. (Id. at 44-45, 223-224 and 233-234). Plaintiff timely filed a Request for Hearing, and on July 19, 2005, Administrative Law Judge Ben Sheely ("ALJ Sheely") held an administrative hearing, which was attended by Plaintiff and her representative. (Id. at 51, 252-274). On November 16, 2005, ALJ Sheely issued an unfavorable decision finding that Plaintiff is not disabled. (Id. at 18-32). Plaintiff's request for review was denied by the Appeals Council ("AC") on March 7, 2007. (Id. at 5-8). As a result, the ALJ's decision became the final decision of the Commissioner in accordance with 20 C.F.R. § 404.981. (Id.) The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

II. **Issues on Appeal**

A.   Whether the ALJ erred by failing to fully and fairly develop the record.

B.   Whether the ALJ erred by improperly substituted his own opinion for that of the treating physician.

C.   Whether the ALJ erred by failing to properly evaluate Plaintiff's diagnosed obesity pursuant to Social Security Ruling 02-01p.

D.   Whether the ALJ erred in failing to make specific findings of

---

[1]Plaintiff's alleged onset date was amended to December 10, 2003 at the hearing. (Tr. 258-259).

2

fact as to the physical and mental demands of Plaintiff's past relevant work pursuant to Social Security Ruling 82-62.

## III. __Factual Background__

Plaintiff was born on April 15, 1964 and was 38 years old at the time of the administrative hearing.  (Tr. 71, 220, 230, 252). Plaintiff has an high school education and past relevant work ("PRW") as a credit reporter at credit bureau.  (_Id_. at 88, 93, 103, 108)  Plaintiff testified that as a credit reporter, she "cleaned up" credit files for mortgage companies.  (Tr. 263). According to Plaintiff, in her credit reporter job, she walked two hours, sat six hours, stooped thirty minutes, grabbed or grasped big objects 15 minutes, write six hours, occasionally lift up to twenty pounds, and frequently lift  ten pounds.  Plaintiff also reported that this job did not require any climbing, kneeling, crouching or crawling, and that she left the job in 2001 because the company downsized.  (Tr. 88-89, 263).

Plaintiff testified that now that her husband has passed, she needs to work, but is unable to do so because of her lung problem[2]. (Tr. 264-265).  She also testified that she smokes half a pack of cigarettes a day, and that she cannot breathe if she is not on Prednisone.  According to Plaintiff, her treating physician, Dr. Schulte, told her that her condition could get better, stay the sme or get worse, and that she might be a candidate for a lung

_____

[2]Plaintiff also reported that in 2001, she suffered a heart attack, from which she has fully recovered. (Tr. 267).

transplant. (Tr. 259-260).

Plaintiff testified that she lives alone, and is able to care for her personal needs.   Plaintiff indicated that she can wash dishes and wash clothes, but that she has to lean on something. She further indicated that her daughter and son-in-law assist her with household chores, that she is able to drive herself to appointments, and that she shops twice a week, with the assistance of a scooter.   Plaintiff further indicated that she spends her time visiting with family, by telephone and in person, watching television and reading magazines. (Tr. 260, 262-263).   Plaintiff testified that she cannot perform tasks for more than a few minutes because she has shortness of breath and tires easily.   (Tr. 260, 261).   Plaintiff also indicated that she has high blood pressure, recurring bronchitis, pneumonia and asthmatic bronchitis. (Tr. 97-101).   According to Plaintiff, her  medications include Plavix, Toprol, Marik, Paxil, Prednisone, and Albuterol.   (Id. at 199).

## IV.  **Analysis**

### A.   **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.   The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[3]   A court

---

[3]This Court's review of the Commissioner's application of legal principles is plenary.   Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").  In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision.  Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

**B.   Discussion**

An individual who applies for Social Security disability benefits must prove his disability.  20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 404.1505(a), 416.905(a).  The Social Security

regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. 20 C.F.R. §§ 404.1520, 416.920.[4]  Additionally, an individual who applies for disabled widow's benefits must show that she is the widow of the deceased wage earner, that she has attained age 50, that she is unmarried[5] and that she is under a disability that began no later than seven years after the wage earner's death.  20 C.F.R. § 404.335(e).

---

[4]The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history.  Id. at 1005.  Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history.  Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).  See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

[5]Exceptions apply to the requirement that Plaintiff be unmarried, none are at issue here.

In case <u>sub judice</u>, the ALJ determined that Plaintiff met the non-disability requirements for disability insurance benefits and for widow's insurance benefits[6].  The ALJ found that she has not engaged in substantial gainful activity since her amended alleged onset date.  <u>Id.</u>  The ALJ concluded that while Plaintiff has the severe impairments of asthma, sarcoidosis, hypertension, and depression, they do not meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4.  <u>Id.</u>  The ALJ found that Plaintiff's allegations regarding her limitations were not totally credible.  (Tr. 30-32).

The ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") for light work, that she should avoid exposure to temperature extremes and caustic chemicals and toxins, and is restricted from activities at unprotected heights, and from climbing ropes, scaffolds, and ladders.  The ALJ further concluded that Plaintiff is mildly restricted in her activities of daily living, and has mild difficulties maintaining social functioning, and maintaining concentration, persistence, or pace.  <u>Id.</u>  The ALJ concluded that Plaintiff's RFC does not preclude her from performing her past work as a credit reporter/manager.  <u>Id.</u>  In the

---

[6]The claimant's prescribed period for widow's benefits begun on December 10, 2003 and ends December 31, 2010.  She was insured for disability purposes on her own account from her amended alleged disability onset date, through December 31, 2004.  (Tr. 30-32).

alternative, the ALJ found that Plaintiff can perform the jobs of cashier, information clerk, or assembler.

The relevant evidence of record shows that Plaintiff was admitted to Mobile Infirmary on June 1, 2001 with chest discomfort, and was found to have acute lateral wall myocardial infarction. She was described as a two-pack per day smoker for 30 years.  The impressions listed on admission were coronary atherosclerotic heart disease, chronic obstructive pulmonary disease with persistent smoking abuse, and secondary family history of coronary disease. Plaintiff underwent a cardiac catheterization.  In the June 3, 1001 Discharge Summary, cardiologist David M. Shaw, M.D., diagnosed Plaintiff with coronary atherosclerotic heart disease; lateral myocardial infarction status post percutaneous transluminal coronary angioplasty of a 9% second diagonal stenosis, no critical disease left anterior descending coronary artery proper, circumflex, right coronary artery, left ventricular function normal 55 to 60% with anterolateral hypokinesis; dysplipidemia; obesity; tobacco abuse; hypertension; and peripheral vascular disease with 75% stenosis of the proximal right ileac artery.  She was counseled on the importance of discontinuing use of tobacco.  (Tr. 111-119).

Treatment notes from Family Medical of Mobile dated June 15, 2001 reflect that Plaintiff still used tobacco, was currently taking Plavix, Zocor, and Toprol, and that she showed improvement on Paxil.  Smoking cessation was recommended, and Wellbutrin was

prescribed as an aid.  (Tr. 124-125).  During a return visit to Family Medical on July 2, 2002, Plaintiff reported cold, cough, and congestion for one week.  On physical exam, it was observed that Plaintiff had rhonchi[7] in both lung fields, bronchitis, normal sinus rhythm, and well-controlled hypertension.  She was prescribed a Z-pack, Clarinex, Atuss EX, and Paxil.  (Tr. 123-124).

Family Medical treatment notes dated April 25, 2003 indicate that Plaintiff reported allergies and coughing and sought a Paxil refill.  On physical exam, it was observed that her ears were clear, throat was not red, she had a slight amount of postnasal drainage, and her heart had equal rate and rhythm. Her lung sound was clear, but she had coarse bronchial breath sounds.  She was prescribed Paxil, Keflex, Poly-Tussin XP, Albuterol inhaler, Lincocin and Decadron.  (Tr. 123).  Plaintiff returned on July 31, 2003, and reported cough and fever.  On physical exam, it was observed that her heart had regular rate and rhythm without murmurs and the lungs had coarse and fine bronchial breath sounds with occasional rhonchus, especially in the bases bilaterally.  A chest x-ray revealed an infiltrate bilaterally in the middle and lower lobes, but especially in the left linguia.  She was prescribed Tequin, Medent DM, Lincocin, and Aristocort.  A treatment note

---

[7]Rhonchi is a whistling or snoring sound in the chest that occurs when air channels are partially obstructed. www.nlm.nih.gov/medlineplus/mplusdictionary (Last visited August 29, 2008).

dated August 7, 2003 reflects that the chest x-ray showed a clearing of the pneumonia, but "not quite gone."   Plaintiff was treated with Medent DM and Levaquin.  (Tr. 122).

During an August 15, 2003 follow-up visit at Family Medical, Plaintiff reported sinus congestion and drainage all her life, and that she was smoking 1 ½ packs of cigarettes per day.   She indicated that she was caring for an elderly aunt; thus, she was unable to stop smoking.  The notes reflect that Plaintiff was using an Albuterol inhaler, that her FEV-1 was 70% of predicted and that the x-ray showed persistent nodular density arcoin lesion in the right mid lung fields that is "highly suspicious for carcinoma."   The notes further reflect that Plaintiff has a big heart, an increase in basilar congestion, and a history of atherosclerotic coronary disease.   It was noted that Plaintiff's description of her breathlessness from walking from one room to the other in her home appeared to be more related to bronchospasm than to pulmonary hypertension and chest failure.  (Tr. 121).

An October 16, 2004 treatment note from Family Medical reflect that Plaintiff has sarcoid with involvement of the lungs and associated hypertension.  Plaintiff reported sinus pressure, cough and congestion.   The treatment notes further reflect that Plaintiff's physical examination was normal.  Her assessment was sinusitis, anxiety, sarcoid with bronchospasm and bronchitis.  Her medications were listed as Claforan, Tussi Organidin, Omnicef and

Dytan.   During a return visit on October 25, 2004, Plaintiff reported cough and congestion for one week.   Her physical exam was normal except for chest rhonchi in both lung fields and bronchitis. (Tr. 217).

Plaintiff was treated at The Heart Group on June 27, 2001 after an anterolateral infarction[8].   Other problems listed were hypertension, continued smoking abuse and chronic obstructive pulmonary disorder ("COPD"). George A. Eyrich, M.D. observed that Plaintiff had marked wheezing on Zyban, and that she improved after its discontinuation.   On physical exam, Dr. Eyrich noted normal jugular vein pulse, normal carotid pulses without bruit, clear lungs, heart with regular rhythm and apical S4, a grade 1/6 midsystolic murmur at apex, flat abdomen with normal bowel sounds, no bruit or tenderness, symmetric and intact pulses in all four extremities, and no varicosities or edema.   Dr. Eyrich's assessment was coronary artery disease, hypertension and peripheral vascular disease.   Plaintiff was "strongly urged" to quit smoking.   (Tr. 137).

Plaintiff had a follow-up visit on August 29, 2001.   Dr. Eyrich observed that Plaintiff had experienced substantial improvement and had no further angina.   He noted problems with

---

[8] Anterolateral myocardial infarction is an extensive anterior infarction that produces indicative changes across the precordium, also on leads l and aVl.   www.drugs.com/dict (Last visited August 29, 2008).

continued smoking and bronchospastic COPD, and that she reported worsening wheezing with Pravachol.  On physical exam, Dr. Eyrich noted blood pressure 150/80, five-pound weight gain in two months, normal jugular vein pulse, lungs with scattered rhonchi, but no rates or wheezes, heart with regular rhythm with apical S4, grade 2/6 systolic murmur, obese abdomen with normal bowel sounds and no tenderness, symmetrical and intact pulses and 2+ dependent edema in extremities.  His assessment was compensated ischemic heart disease and suboptiminally controlled hypertension.  Plaintiff was again strongly urged to stop smoking.  (Tr. 136).

Plaintiff had a follow-up visit with Dr. Eyrich on November 29, 2001.  Plaintiff reported that she had substantially reduced her smoking from 2 ½ packs per day to five cigarettes per day, and that she still had bronchitis and intermittent wheezing.  Plaintiff also reported crying spells for a few days after she reduced her smoking.  On physical exam, Dr. Eyrich observed blood pressure 130/70, .75 weight gain in two months, normal jugular vein pulse, lungs with scattered rhonchi, but no rates, wheezes or respiratory distress, heart with regular rhythm with apical S4, grade 2/6 systolic ejection murmur at the left sternal border, intact pulses and no significant edema.  His assessment was compensated ischemic heart disease and controlled hypertension. Plaintiff was strongly urged to stop smoking.  (Tr. 135).

In a treatment note dated March 27, 2002, Dr. Eyrich observed

that Plaintiff has hypertension, hyperlipidemia, COPD with persistent smoking abuse and substantial bronchospastic problems. On physical exam, Dr. Eyrich observed blood pressure 142/80, 2.5 weight gain in four months, normal jugular vein pulse, normal carotid pulses without bruits, prolonged expiration without overt rhonchi or wheezes, heart with regular rhythm with apical S4, grade 1/6 systolic ejection murmur and no extremity edema. His assessment was exertional bronchospasm, possibly recurrent ischemia. Plaintiff was reminded that she needed to stop smoking. (Tr. 134).

A March 29, 2002 Myoview Exercise Test showed normal sinus rhythm with possible anterior scar, isolated pulmonary venous congestion and nonspecific ST-T abnormalities on baseline EKG; poor exercise performance; no major ST segment changes were noted during the test; and occasional isolated pulmonary venous congestion, but no sustained arrhythmia. (Tr. 145). A Myoview Myocardial Perfusion Scan dated March 29, 2002 showed 65% ejection fraction, small to moderate reversible inferoapical defect consistent with ischemia and normal wall motion. (Tr. 144).

Dr. Eyrich's treatment notes dated May 30, 2002 reflect that Plaintiff had hypertension, hypertriglyceridemia with low HDL, cholesterol, COPD with persistent one pack per week smoking abuse, asthma and hypertension. Dr. Eyrich noted that Plaintiff reported feeling well with no shortness of breath, chest discomfort, unusual

fatigue or other cardiovascular symptoms.   He observed that her activity tolerance was good and that she was "quite active."   On physical exam,  Dr. Eyrich observed blood pressure 128/80, 1.5 weight loss in two months, normal jugular vein pulse, normal chest pain syndrome without bruits, no thyroid enlargement or nodules, clear lungs, heart with regular rhythm with apical S4, grade 2/6 systolic ejection murmur, obese abdomen with normal bowel sounds and no bruits, masses or tenderness,  intact and symmetrical pulses and no edema.  His assessment was  hypertension,  well-compensated coronary disease and COPD. (Tr. 133).

Dr. Eyrich's treatment notes dated June 18, 2003 reflect  that Plaintiff had been doing fairly well but was under a great deal of stress caring for a 90-year-old aunt.  She reported chest tightness when she is upset which last 15 to 20 minutes and that she had exertional dyspnea when walking.  She further reported smoking five to ten cigarettes per day.  On physical exam, Dr. Eyrich observed blood pressure 150/80, weight gain of 5.75 pounds in eight months, normal jugular vein pulse, normal carotid pulses without bruits, clear lungs, heart with regular rhythm with apical S4, grade 2/6 midsystolic murmur and extremities with no edema.  His assessments was chest tightness.  He noted that an abnormal nuclear test in March 2002 suggested ischemia.  Dr. Eyrich ordered an EKG, and encouraged Plaintiff to quit smoking.  (Tr. 131).

An  Echocardiogram Report dated June 18, 2003 resulted in

conclusions of normal left ventricular size and wall motion with ejection fraction 0.60; mild bi-atrial enlargement; mild mitral regurgitation; and mild tricuspid regurgitation with a regurgitant gradient suggesting mild to moderate pulmonary hypertension. (Tr. 141). A Persantine Cardiolite Stress Test dated June 19, 2003 resulted in conclusions of unremarkable persantine cardiolite and no EKG changes. (Tr. 143). A Persantine Cardiolite Myocardial Perfusion Scan dated June 19, 2003 resulted in conclusions of mild, small to moderate antero-lateral fixed defect and normal left ventricular wall motion with ejection fraction 0.66. (Tr. 142).

Plaintiff was again treated for followup of coronary disease post-intervention, hypertension, and COPD with persistent smoking abuse on October 23, 2003. Dr. Eyrich noted that Plaintiff had a work-up of a solitary pulmonary nodule with bronchoscopy and mediastinoscopy with negative results, that she had no angina, and that she smoked ½ pack of cigarettes per day. On physical exam, he observed that her blood pressure was 144/80, jugular vein pulse was normal, lungs had prolonged expiratory phase without overt rales, rhonchi or wheezes, heart with regular rhythm with apical S4, grade 2/6 midsystolic murmur, and extremities with no edema. His assessment was listed as suboptimally controlled hypertension, well compensated coronary disease, fixed defect on June 19, 2003 cardiolite test, and unabated smoking abuse of ½ pack per day. (Tr. 130).

During a March 24, 2004 follow-up visit, Plaintiff reported being very low because her husband died in December 2003. She reported exertional dyspnea but no chest discomfort. On physical exam, it was observed that her jugular vein pulse was normal, lungs were clear, heart with regular rhythm with apical S4, grade 1-2/6 systolic ejection murmur, and extremities had no edema. Her assessment was well compensated coronary disease, unabated smoking abuse and uncontrolled hypertension. (Tr. 202).

During an August 12, 2004 visit, Plaintiff reported increasing exertional dyspnea, which was a large limitation, mild chronic productive cough with no subjective bronchospasm and no orthopnea and shortness of breath when she sleeps that requires her to sit up. She further reported dependent edema, and chest tightness or heaviness with exertional dyspnea. Dr. Eyrich noted her mild small to moderate anterolateral fixed defect. On physical exam, it was observed that her blood pressure was 140/98, jugular vein pulse was normal, lungs were clear without rates or wheezes, heart with regular rhythm with apical S4, grade 2/6 midsystolic murmur, and extremities with 1+ edema. His assessment of Plaintiff was exertional dyspnea, either COPD or angina equivalent. (Tr. 201).

In a January 19, 2005 clinical note, Dr. Eyrich observed that Plaintiff returned for follow-up visit. He noted that Plaintiff had good control of her asthma and sarcoidosis on Prednisone, and that she had gained weight but had no chest discomfort suggesting

angina.   On physical exam, he observed her blood pressure was 140/80, jugular vein pulse was normal, lungs were clear, heart with regular rhythm with apical S4, grade 1/6 midsystolic murmur, and extremities with no edema.   His assessment was well-compensated coronary disease and fairly well controlled hypertension.   (Tr. 200, 213).

Plaintiff was treated by William J. Schulte, M.D., beginning on August 21, 2003.   She was referred to him by Dr. Irving due to an abnormal CT scan.   Dr. Schulte's notes reflect that Plaintiff reported smoking two packs of cigarettes a day, and had done so for 30 years, that she was short of breath with any intense exertion. He noted that she was not short of breath when walking or doing usual daily activities.   He noted her angioplasty in 2001 and history of hypertension, and that she reported that she had not experienced any chest pain recently.  (Tr. 152).

Dr. Schulte noted a normal physical exam, but that the chest x-ray showed full right hilum, and that the CT scan shows the same. (Tr. 153).  Plaintiff underwent a bronchoscopy on August 28, 2003, and the biopsy resulted in finding mild fibrosis with embedded aggregates of iron pigment and scattered siderophages; small noncaseating giant cell epitheloid granuloma, and negative malignancy.  (Tr. 157).  An x-ray dated August 20, 2003 showed interstitial changes with hilar adenopathy suggesting sarcoidosis, and that lympho-proliferative disease such as lymphoma should be

considered.    (Tr. 166).

A Pulmonary Function Report dated August 21, 2003 noted that Plaintiff's FEV 1 was 66%, and the interpretation resulted in a finding of mild restrictive ventilatory defect.   (Tr. 164).   A report of a thorax CT with contrast dated August 20, 2003 noted bilateral hilar and mediastinal adenopathy, stating that sarcoidosis and proliferative disease such as lymphoma should be considered.   The CT also showed a small stone in the gallbladder, and increased interstitial markings without focal lesions, which suggested sarcoidosis.  (Tr. 167).

During an October 27, 2003 visit to Dr. Shulte, Plaintiff reported that she was still smoking a pack of cigarettes a day. She also reported no cough, but a little shortness of breath when anxious or concerned about her husband, who had esophageal cancer. Dr. Shulte observed that Plaintiff had bilateral hilar adenopathy with negative bronch and negative mediastinoscopy, and probable sarcoidosis.   Her physical exam was normal, and a chest x-ray showed no change in bilateral hilar adenopathy.   (Tr. 148). Plaintiff was next seen by Dr. Shulte on January 22, 2004.   She reported that she was still smoking and having difficulty breathing.   Her physical exam was normal, and there was no change in hilar adenopathy on the chest x-ray.  (Tr. 146).

On December 30, 2004, Dr. Schulte observed that Plaintiff reported feeling a lot better.   She was still short of breath on

Prednisone, but was not coughing up anything significant, and experienced no fever, chills, nausea, vomiting or diarrhea. She had lost about eight pounds, but was still smoking a pack of cigarettes a day. Her physical exam was normal, and a chest x-ray showed no change in bilateral hilar adenopathy. Dr. Shulte's assessment was "stable sarcoid." (Tr. 214).

In office notes dated April 5, 2005, Dr. Shulte observed that Plaintiff reported doing pretty well, but that her breathing was worse lately and she was having symptoms like sleep apnea. He noted that she had gained weight and was still smoking one pack of cigarettes per day. Her physical exam was normal. (Tr. 209). She returned to Dr. Schulte on July 5, 2005, reporting more shortness of breath and a recent episode of asthmatic bronchitis. She further reported being unable to reduce Prednisone, that Advair was causing a sore throat, and that she was still smoking a pack of cigarettes a day. Dr. Schulte observed that Plaintiff's physical exam was normal. His impression was stable sarcoid. Dr. Shulte notes reflect that he talked to Plaintiff about lung transplant, and that she was not interested in it at that time. (Tr. 206).

David Formwalt, Psy,D., conducted a mental examination of Plaintiff on February 19, 2004 at the request of the Agency. Dr. Formwalt observed that Plaintiff's grooming and hygiene were good, gross motor skills were superficially normal, that she exhibited labored breathing after walking from the waiting area to the

examination room, that she was pleasant and cooperative, and that she seemed socially confident and comfortable.  He described her speech as normal rate, productivity and volume, that she was oriented times four, and that her mood appeared depressed in that she was tearful at times but was appropriate to content of thought and conversation. He reported that Plaintiff's immediate, recent, and remote memory appeared intact, that her thought process and content were logical, coherent and goal-directed, and that she did not appear confused with no evidence of hallucinations or delusions.

Dr. Formwalt further noted that Plaintiff was able to follow a three-step verbal command, and follow three word sentence instructions. He stated that she had good judgment and insight and estimated her intellectual functioning to be within the average range.  He found that Plaintiff can attend to her hygiene needs, dress without assistance, cook and prepare meals, and do light cleaning duties, and that she is able to drive.  Dr. Formwalt opined that Plaintiff would likely benefit from medication and therapy over the next six to twelve months which would enable her to deal with her depressive disorder and the grief process.  (Tr. 169-172).

William Lynn, Ph.D., a Disability Determination Service psychologist, completed a Psychiatric Review Technique dated  March 19, 2004.  He diagnosed Plaintiff with dysthymic disorder, and

opined that she is mildly limited in her activities of daily living, and has mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  He indicated that he has insufficient evidence to determine whether Plaintiff had experienced repeated episodes of decompensation. (Tr. 173-187).

A Residual Functional Capacity ("RFC") was completed by a Disability Specialist and dated March 23, 2004.  The specialist opined that Plaintiff can lift 20 pounds occasionally and 10 pounds frequently, and can stand, walk, or sit about six hours in an eight-hour workday.  The Specialist further opined that Plaintiff could push and/or pull with hand or foot control without limits, and that she had no postural, manipulative, visual, communicative, or environmental limitations (Tr. 188-195).

    **1.**    **Whether the ALJ erred by failing to fully and fairly develop the record.**

Plaintiff asserts that the ALJ failed to fully and fairly develop the record because while the record contains a residual functional capacity assessment (hereinafter "RFC")[9] drafted by a disability specialist, the record does not contain one drafted by a physician. (Doc. 11, p. 5).  Extant case law provides that an ALJ has a duty to develop the record fully and fairly.  See, e.g.,

_____

[9]The RFC is an assessment of the claimant's ability to lift weight, sit, stand, push, and pull, among other tasks. 20 C.F.R. § 404-1545(b).

Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999) (citing Graham
v. Apfel, 129 F.3d 1420, 1422-1423 (11th Cir. 1997)); Cowart v.
Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  The ALJ is bound to
make every reasonable effort to obtain all the medical evidence
necessary to make a determination, 20 C.F.R. § 416.912(d); however,
he is not charged with making Plaintiff's case for her.  Plaintiff
has the burden of proving that she is disabled.  See 20 C.F.R. §
416.912(a) and (c).  See also Hale v. Bowen, 831 F.2d 1007, 1011
(11th Cir. 1987). In analyzing a plaintiff's claim, the ALJ must
determine if the claimant is limited to a particular work level.
Phillips v. Barnhart, 357 F. 3d 1232, 1238 (11th Cir. 2004).
Although a claimant may provide a statement containing a
physician's opinion of her remaining capabilities, the ALJ will
evaluate such a statement in light of the other evidence presented.
The ultimate determination of disability is reserved for the ALJ.
20 C.F.R. §§ 404.1513, 404.1527, 404.1545.

In the case at hand, the  ALJ discussed the medical evidence
in determining Plaintiff's RFC and observed as follows:


> The evidence establishes that the claimant does not
> have medically determinable impairments that limit her
> functional ability...
>
> For instance, there is no evidence to show that the
> claimant cannot frequently lift and/or carry up to
> 10 pounds and occasionally lift and/or carry up to 20
> pounds.  Nor does the evidence show that the claimant
> cannot stand and/or walk up to six hours in an
> entire eight-hour workday.  Dr. Shulte, the claimant's

respiratory specialist, stated in December 2004 that
the claimant had "stable sarcold."  In July 2005,
Dr. Shulte described the claimant's shortness of breath
as "mild."  Repeated physical examinations by
Dr. Shulte reveal that the claimant had no
musculoskeleta arthritic complaints or edema; her
breath sounds were equal and clear to auscultation
bilaterally; and her heart sounds were normal.  Most
importantly, nowhere in Dr. Shulte's records are
limitations or restrictions on the claimant's activities
evident. . . . .

(Tr. 26)

The claimant retains the residual functional capacity to
perform work activities at the light exertional level.
She can sit at least six hours total in an entire eight-
hour workday; she can stand/walk up to six hours in an
entire eight-hour workday; she can frequently lift/carry
10 pounds and up to 20 pounds occasionally.  She has no
postural limitations but because of her respiratory
impairment should avoid exposure to temperature extremes
and caustic chemicals and toxins.  The claimant is
restricted from activities at unprotected heights because
of obesity and is restricted from climbing ropes,
scaffolds, and ladders because of her respiratory
impairment and obesity.  For the duration period the
claimant has had no significant limitation in her ability
to understand, remember, and carry out instructions,
respond appropriately to supervision, co-workers, and
work pressures in a work setting; she can communicate,
act in her own interest, adjust to ordinary emotional
stresses, get along with others, and do her usual daily
activities without assistance.  The claimant has mild
restriction of activities of daily living; mild
difficulties maintaining social functioning; mild
difficulties maintaining concentration, persistence, or
pace; and no repeated episodes of decompensation, each of
extended duration.

(Tr. 31).  This residual functional capacity is supported by the

claimant's treating physicians, as well as the absence of

functional limitations placed on the claimant by any medical

source.  A review of the ALJ's decision reflects that he carefully

23

considered the medical evidence in the record, including the treatment notes of Plaintiff's treating physicians, in determining Plaintiff's RFC. While Plaintiff asserts that a physician's RFC assessment was required, she has not demonstrated that the ALJ did not have enough information to enable him to make a RFC determination, nor has she pointed to any medical evidence which suggests that the ALJ's RFC assessment is incorrect. As aptly observed by the ALJ, the medical records do not evidence any functional limitations and none of Plaintiff's physicians limited her activities. (Tr. 26). The medical records instead demonstrate that while Plaintiff has severe impairments, her conditions, such as asthma and hypertension, are stable, and are controlled with medication. Accordingly, the undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff possesses the RFC to perform light work. See Green v. Social Security Administration, 223 Fed. Appx. 915, 2007 U.S. App. LEXIS 10121 (11th Cir. May 2, 2007).

**2.   Whether the ALJ erred by improperly substituted his own opinion for that of the treating physician.**

Plaintiff argues that the ALJ erred in that he "speculated and made assumptions about a treating source's opinion," rather than re-contacting the medical source for clarification of the reasons for his opinion. (Doc. 11 at 6-7). An ALJ's duty to re-contact a treating source is set forth in Social Security Ruling 96-5p: *Titles*

*II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner* ("SSR 96-5p") as follows:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

Additionally, 20 C.F.R. §§ 405.1512(e), 416.912(e) places a responsibility on the ALJ to re-contact treating sources in limited circumstances:

> (e) *Recontacting medical sources.* When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.
>
> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

Plaintiff argues that a single statement in Dr. Shulte's treatment record, that references a discussion with Plaintiff about the possibility of a lung transplant, triggered the ALJ's obligation to seek additional information from Dr. Shulte. As a preliminary matter, the obligation to re-contact a physician or other treating source only arises when the ALJ is unable to

25

ascertain the basis of the physician's opinion.  In this case, no
such obligation arose because Dr. Shulte's treatment notes are not
vague or unclear.  His notes track his treatment of Plaintiff from
August 21, 2003 through at least July 2005.  In connection with his
treatment of Plaintiff, Dr. Shulte repeatedly described her
condition as "stable" or as having "no change."  (Tr. 146, 148,
206, 214).  Additionally, the treatment notes do not reflect that
Dr. Shulte imposed any restrictions on Plaintiff's activities.
Moreover, during the administrative hearing, Plaintiff testified
that during her discussion with Dr. Shulte regarding a lung
transplant, he told her that her condition might improve, stay the
same or get worse, and that if it got worse, she might need a lung
transplant.  (Tr. 260).  Based on Plaintiff's own testimony, Dr.
Shulte's comment regarding a lung transplant can be described as
speculative at best.  The undersigned finds, given the totality of
the medical records, that a single reference to a lung transplant
was not sufficient to trigger the ALJ's obligation to follow-up
with Dr. Shulte for clarification.  This is particularly true where
the other medical evidence of record reflects that Plaintiff has no
functional limitations.

    With respect to Plaintiff's depression claim, she appears to
argue that the record with respect to this claim is incomplete.
Contrary to Plaintiff's assertion, a review of the record reveals
that while the ALJ considered the medical records of Dr. Irving, one
of Plaintiff's treating physicians, he also ordered a consultative

examination by psychologist David Formwalt, Psy, D., who completed a written report detailing his mental evaluation of Plaintiff. (Tr. 169-172).    Additionally, William H. Lynn, P.h.D., reviewed Plaintiff's medical records, and completed a Psychiatric Review Technique form at the request of the Agency.  In his report, Dr. Lynn opined that the medical evidence demonstrates mild limitations in Plaintiff's social functioning, daily activities and concentration.  (Tr. 173-187).  In view of the evidence in the record regarding Plaintiff's mental impairment, the Court finds that the ALJ did not err in failing to re-contact Dr. Irving, as the evidence of record was adequate to ascertain Plaintiff's limitations arising from depression.  Moreover, the ALJ's determination with respect to the effect of Plaintiff's mental impairment is supported by substantial evidence.

3.    **Whether the ALJ erred by failing to properly evaluate the Plaintiff's diagnosed obesity pursuant to Social Security Ruling 02-01p.**

Plaintiff argues that the ALJ incorrectly stated that no physician had diagnosed her with obesity, and that his determination that her obesity does not place significant restrictions on her ability to perform work activity was inconsistent with his decision to include work restrictions based on her obesity in his assessment of her RFC.  Social Security Ruling 02-1p: *Titles II and XVI: Evaluation of Obesity* ("SSR 02-1p") SSR 02-1p requires that the ALJ consider the effects of obesity at steps three and four when

combined with other impairments.  In assigning Plaintiff a RFC, the ALJ considered Plaintiff's limitations resulting from obesity as follows:

> The claimant is restricted from activities at unprotected heights because of obesity and is restricted from climbing ropes, scaffolds, and ladders because of her respiratory impairment and obesity.

(Tr. 29).  As a threshold matter, the undersigned finds that although Plaintiff is correct that the ALJ erroneously stated  that Plaintiff has not been diagnosed with obesity, it is clear that the ALJ considered Plaintiff's obesity in determining her RFC.   20 C.F.R. §§ 405.1545(a)(2) and 416.945(a)(2) provides that an ALJ will consider even medically determinable impairments that are not severe in assessing a Plaintiff's RFC.  In this case, Plaintiff did not allege obesity as an impairment in her application for benefits, and did not testify that she experienced any limitations as a result of obesity.   Additionally, none of Plaintiff's physicians identified any functional limitations resulting from her obesity.   Notwithstanding this lack of record evidence, the ALJ properly considered Plaintiff's obesity, in conjunction with her other impairments, in determining her RFC.  As noted supra, he restricted her from activities at unprotected heights and from climbing ropes, scaffolds, and ladders due to her obesity.  Aside from asserting that the ALJ was incorrect in stating that she had not been diagnosed with obesity, Plaintiff has not demonstrated that the ALJ did not properly consider her obesity, or that his RFC

28

assessment was not supported by substantial evidence.  Accordingly,
her claim regarding her obesity must fail.  See French v. Astrue,
2008 U.S. Dist. LEXIS 24105 (S.D. Ala. Mar. 26, 2008)("[E}ven
assuming the ALJ erred in failing to specifically find that
plaintiff's chronic foot pain was a severe impairment, such error
was harmless since the evidence of record establishes that this
condition would not entail any significant work-related limitations
of function....");  Newsome v. Barnhart, 444 F. Supp. 2d 1195, 1201
(M.D. Ala. 206)("[T]o the extent the ALJ erred in failing to make
an explicit determination as to whether plaintiff's secondary
diagnosis of ODD constituted a severe impairment at step two of the
sequential evaluation—the error was harmless. '[W]hen an incorrect
application of the regulations results in harmless error because
the correct application would not contradict the ALJ's ultimate
findings, the ALJ's decision will stand.'")(citations omitted).

**4.** **Whether the ALJ erred in failing to make specific findings of fact as to the physical and mental demands of her past relevant work pursuant to Social Security Ruling 82-62.**

Plaintiff contends that the ALJ erred in failing to
specifically set forth the physical and mental demands of the past
relevant work of credit reporter/investigator or to discuss the
plaintiff's ability to meet those demands as required by Social
Security Ruling 82-62: *Titles II and XVI: A Disability Claimant's*
*Capacity to Do Past Relevant Work, In General* ("SSR 82-62") Social

Security Ruling 82-62.[10]  The ALJ determined that Plaintiff's past relevant work as a credit reporter/investigator does not require the performance of work-related activities precluded by her RFC, and in the alternative, found that Plaintiff could perform the jobs of cashier, information clerk, or assembler, which are not inconsistent with her vocational factors and RFC.  (Tr. 31-32).

The record reflects that during the administrative hearing, Plaintiff testified that as a credit reporter, she "cleaned up" credit files for mortgage companies. (Tr. 263).  Additionally, Plaintiff completed a disability report wherein she indicated that in her credit reporter job, she walked two hours, sat six hours, stopped thirty minutes, grabbed or grasped big objects 15 minutes, wrote six hours, occasionally lifted up to twenty pounds, and frequently lifted ten pounds.  Plaintiff also reported that this job did not require any climbing, kneeling, crouching or crawling. (Tr. 88-89).  The record also contains the testimony of the VE, whose testimony the ALJ relied upon in reaching his decision.  The ALJ observed as follows:

> At the hearing [,] Ms. Skinner, the vocational expert, testified that the claimant's past relevant work as a credit reporter/investigator for a mortgage company was skilled work performed at the sedentary exertional level. The vocational expert further testified that considering the claimant's established residual functional capacity she could perform her prior work as a credit reporter/investigator as she performed that work and as

---

[10]SSR 82-62 requires that any decision finding a Plaintiff capable of returning to his past work requires specific findings of fact as to the Plaintiff's RFC, the physical and mental demands of the past job/occupation, and that the Plaintiff's RFC would permit a return to past work.

it is generally performed in the national economy.

In the alternative, the vocational expert testified that
a hypothetical individual of the claimant's age,
education, and past work experience with the above-
described residual functional capacity could perform the
jobs of cashier (852,555 such jobs in the national
economy and 15,818 jobs in the regional economy);
information clerk (186,000 such jobs in the national
economy and 14,970 jobs in the regional economy); and
assembler (496,369 such jobs in the national economy and
7,481 jobs in the regional economy.)

(Tr. 30).

While Plaintiff contends that the ALJ did not review the
physical and mental demands of her past work to determine if she
could perform her past work, the above-referenced evidence clearly
demonstrates that the record contains evidence of the demands of
Plaintiff's past work in the form of her testimony, her disability
report, and the testimony of the VE. Moreover, it is significant
that the ALJ, in reliance on the VE's testimony, determined, in the
alternative, that other jobs exist in significant numbers in the
state and national economies that Plaintiff can perform based on
her age, education and RFC, including her non-exertional
limitations. While Plaintiff appears to suggest that the
hypothecials posed to the VE were unclear, she had not identified
any information included in the questions that was unclear or
contrary to the record evidence. To the contrary, a review of the
record demonstrates that the ALJ's questions to the VE regarding
alternative positions that Plaintiff could perform were supported
by the evidence. Thus, assuming arguendo that the ALJ did not set

forth the physical and mental demands of Plaintiff's past work as clearly as he should have, the ALJ's alternative finding that other jobs exist in significant numbers in the state and national economies that Plaintiff can perform is supported by substantial evidence.  Thus, Plaintiff's claim must fail.

**V.**    <u>**Conclusion**</u>

For the reasons set forth, and upon careful consideration of the administrative record, memoranda of the parties and oral argument, it is **RECOMMENDED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for period of disability and disability insurance benefits, be **AFFIRMED.**

The attached sheet contains important information regarding objections to this <u>Report and Recommendation</u>.

**DONE** this **27**th day of **August, 2008.**

<u>      /s/ SONJA F. BIVINS      </u>
**UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.   **Objection**.   Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.   See 28 U.S.C. § 636(b)(1)©; Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).   The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.   The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.   It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.   Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**   Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is

advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**